# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>HAMDAN MAHAMA | No. 3:23-cr-177 (SRU) |

### <u>ORDER ON MOTION TO SUPPRESS</u>

The defendant, Hamdan Mahama, was charged in a single-count indictment with unlawful possession of a firearm by an alien. *See* Indictment, Doc. No. 17; 18 U.S.C. § 922(g)(5). Mahama moves to suppress all of the physical evidence against him because, despite being seized pursuant to a warrant, the police obtained that warrant as a result of an initial warrantless search of his home that he argues violated his Fourth Amendment rights.

For the reasons described below, Mahama's motion to suppress, doc. no. 34, is **granted.**

## I.     Legal Standard

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A "search" within the meaning of the Fourth Amendment occurs when "police seek information by intruding on a person's reasonable expectation of privacy or by means of trespassing upon one's person, house, papers, or effects." *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Ordinarily, a police search

of a person's home must be conducted pursuant to a warrant signed by a neutral, detached magistrate, and warrantless searches are presumed unlawful unless one of a few specific exceptions to the warrant requirement applies. *Katz v. United States*, 389 U.S. 347, 356-57 (1967).

The exclusionary rule is the recognized remedy for a Fourth Amendment violation. The exclusionary rule is the "principal mode of discouraging lawless police conduct," *Terry v. Ohio*, 392 U.S. 1, 12 (1968), and therefore prohibits the use of any evidence "obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

When a defendant moves to suppress evidence against him, "the burden of production and persuasion generally rest upon the movant." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)). "Once the defendant has established some factual basis for the motion," however, "the burden shifts to the government to show that the search [or seizure] was lawful." *United States v. O'Neill*, 2016 WL 6802644, at *8 (W.D.N.Y. Nov. 17, 2016) (citations omitted). The party that bears the burden of proof must carry that burden by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 169 (1986).

## II.      Background and Findings of Fact

I held an evidentiary hearing on Mahama's motion to suppress on August 8, 2024. *See* Minute Entry, Doc. No. 62. At the hearing, New Britian Police Officer Derek Andrade and Detectives Karl Mordasiewicz and Francshesca Bjorklund testified. The government and the defendant each also introduced exhibits, including footage from the testifying officers' body worn cameras, which I have reviewed in full. All citations to exhibits throughout this Order will

refer to exhibits presented at the suppression hearing. Based upon the testimony and exhibits presented at the suppression hearing, I find the following facts.

Lorie Leger, the landlady of a rooming house in New Britain, Connecticut, rented a room to the defendant, Hamdan Mahama. *See* Lease Agreement, Ex. 5. On July 31, 2023, Leger entered Mahama's room because she noticed cockroaches and rodents coming out from his room into the neighboring room. *See* 911 Call, Ex. 1. When she entered the room and began investigating and cleaning up the source of the insects, she noticed multiple firearms in the closet of the room, and lined them up on Mahama's bed. She then called the police to report the firearms. Officer Derek Andrade of the New Britain Police Department arrived at the house and spoke with Leger outside. *See* Body Camera Footage, Ex. 2. Two other individuals were present, and Leger and one of those individuals were wearing latex gloves.

During his initial conversation with Leger outside of the house, Leger explained to Officer Andrade the reason for her search of Mahama's room, that Mahama was behind on rent, that she had not seen him for multiple weeks, and that she intended to but had not yet initiated the legal process to evict him. Leger described the number and type of firearms that she had found, and stated that she had not taken a photograph of the firearms. Leger also provided Officer Andrade with a piece of mail addressed to "Hamden Mahama," and a lease agreement in the name "Derick Hamden." *See* Ex. 2; Lease Agreement, Ex. 5. Officer Andrade explained to Leger that he was not sure he could enter Mahama's room and seize the firearms because Mahama was not present and had not been formally evicted. *See* Ex. 2, at 6:20 (describing the situation as "muddy waters"). Officer Andrade then went to his car to consult with a supervisor over the phone. That call is not captured on body camera video, nor is its substance summarized in any police reports. Officer Andrade testified at the suppression hearing that his supervisor

instructed him to enter the room and to take a photograph of the firearms to verify that the firearms were real.

After speaking with his supervisor, Officer Andrade returned to the house and followed Leger upstairs to a room with the number "4" on the door. *See* Body Camera Footage, Ex. 3. Leger unlocked the door and let Officer Andrade inside. Inside the room there were several firearms laid out on a bed. Officer Andrade used a glove to move one firearm from under a blanket to be completely visible, opened a closed container to reveal another firearm, and took one photograph of the firearms. He then texted that photograph to other officers, who read a single serial number off one of the firearms and ran that serial number through a database that revealed that the firearm was stolen. *See* Police Reports, Ex. A, at 101.

On the basis of the belief that at least one of the firearms was stolen, Detectives Bjorklund and Mordasiewicz applied for a warrant to re-enter the apartment to view and photograph all of the firearms. *See* Ex. 6. That warrant was signed by Hartford Superior Court Judge Laura F. Baldini on August 1, 2023. *Id.* Officers executed the search warrant the same day, and, on the basis of information gathered during that search, Detectives Bjorklund and Mordasiewicz applied for and obtained a second warrant to seize all of the weapons that are listed in the indictment in this case. *See* Ex. 7.

In sum, Officer Andrade's initial warrantless entry into Mahama's room led to information that supported a warrant to conduct a full search of Mahama's room, which led to information that supported a warrant to seize all of Mahama's firearms.

Mahama was ultimately indicted for unlawful possession of a firearm by an alien, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(8), on October 18, 2023. *See* Doc. No. 17. He filed the instant motion to suppress, doc. no. 34, on May 3, 2024.

### III.    Discussion

Mahama argues that suppression is required because Officer Andrade's initial entry into his locked bedroom violated his Fourth Amendment right to be free from unreasonable searches and seizures. The firearms ultimately seized by the New Britain Police Department, which give rise to the indictment against Mahama, were seized after two warrants were issued by Connecticut judges—one to search the bedroom and photograph all firearms, and a second to seize all firearms. *See* Exs. 6, 7. However, there is no dispute that those search and seizure warrants were obtained as a result of the initial entry by Officer Andrade into Mahama's room without a warrant. *See* Ex. 6 (stating that there was probable cause to believe the firearms were stolen in violation of state law on the basis of the photograph taken by Officer Andrade during his initial search). Therefore, the firearms represent the fruits of a Fourth Amendment violation and should be suppressed unless the government can prove that an exception either to the warrant requirement or to the exclusionary rule is satisfied. *See Wong Sun*, 371 U.S. 471 (1963).

Significantly, there is no dispute that Officer Andrade's entry into Mahama's room to take a photograph of his guns *did* constitute a search within the meaning of the Fourth Amendment. The most basic definition of a search is a physical intrusion into a person's home, *see Florida v. Jardines*, 569 U.S. 1, 5 (2013), and Officer Andrade is clearly seen on body camera video walking right into Mahama's room to view and photograph the guns. *See* Body Camera Footage, Ex. 3. Moreover, the fact that a person rents a bedroom in a shared house does not undermine the conclusion that their bedroom is a "home" protected by the Fourth Amendment. *See, e.g., McDonald v. United States*, 335 U.S. 451, 455-56 (1948) (warrantless search of a room in a rooming house violated the Fourth Amendment). Therefore, because warrantless searches of a home are presumed unreasonable "notwithstanding facts unquestionably showing probable cause," *Katz*, 389 U.S. at 357 (quoting *Agnello v. United*

*States*, 269 U.S. 20, 33 (1925)), it is the government's burden to prove that some exception to the warrant requirement or to the exclusionary rule is satisfied.

The government argues that two exceptions to the warrant requirement rendered Officer Andrade's initial search reasonable. *See* Opp'n, Doc. No. 50, at 14-18. Alternatively, the government argues that even if the initial warrantless search was unreasonable, the exclusionary rule does not apply because the evidence was seized in good faith reliance on a warrant signed by a judge. *See id.* at 18-22. I will address each of those arguments in turn.

A.  Exceptions to the Warrant Requirement

1.  *Landlord's Consent*

First, the government contends that the initial warrantless search was reasonable because Leger, Mahama's landlord, consented to the search. *See* Doc. No. 50, at 14. That argument fails. It is true that a third party with common authority over a premises can consent to a search of those premises. *See United States v. Matlock*, 415 U.S. 164, 171 (1974) ("[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it . . . may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."). But "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property," and instead rests on mutual use, control, or co-habitation. *Id*. at 171 n.7. The law is clear that a landlord cannot consent to the search of a tenant's apartment. *United States v. Brown,* 961 F.2d 1039, 1041 (2d Cir. 1992) ("A landlady is not ordinarily vested with authority to authorize a search of premises leased to a tenant.") (citing *Chapman v. United States*, 365 U.S. 610, 616–18 (1961)); *State v. Zindros*, 189 Conn. 228, 249 (1983) ("[A]ny right to inspect under

6

the lease could not be enlarged here to authorize consent to officers to enter to gather evidence of a crime by the defendant.").

The government relies on *United States v. Botsch*, 364 F.2d 542 (2d Cir. 1966), for the proposition that a landlord who has been authorized to enter their tenant's premises for a limited purpose has the authority to consent to a police search. *See* Opp'n, Doc. No. 50, at 16. But as Mahama points out in his reply, the landlord in the *Botsch* case had a contractual right to access the tenant's storage shack to accept deliveries, and through exercising that right of access she had become an unknowing accomplice to a crime. *Botsch*, 364 F.2d at 547-48. The Second Circuit concluded that the landlord in that case had the authority to consent to a search of her tenant's shack in order to dispel any suspicions against her. *Id.*; Reply, Doc. No. 56, at 3-5. Here, Leger's authority to enter Mahama's room was only for purposes such as inspecting, conducting repairs, and showing the room to a prospective renter. *See* Lease Agreement, Ex. 5 (stating that the landlord can enter the apartment to "[o]verse the condition of [the] property, visit common areas, general maintenance, repairs, collecting rent, to show for rental or for sale, suspected abandonment and/or odor"). It can be assumed, for example, that Leger's contractual authority to enter Mahama's room included the authority to consent to an exterminator, plumber, or other professional entering Mahama's room to conduct repairs. But consenting to a police search of a tenant's room implicates the tenant's Fourth Amendment rights, and is not something that the lease agreement authorized Leger to do. *See Brown*, 961 F.2d at 1041 (a landlord's "authority granted for a limited purpose does not translate into a general authority to authorize a search").

As Mahama's counsel pointed out at oral argument, the lease agreement essentially gave Leger only the authority every landlord has under Connecticut law to oversee their rented property. *See* Conn. Gen. Stat. § 47a-16. To hold that the lease's generic language granted Leger

the authority to consent to a police search of Mahama's room would mean that most, if not all, tenants in Connecticut forfeit their privacy rights when they sign a standard lease agreement. The Fourth Amendment cannot be so blithely overcome. I conclude that Leger did not have the authority to consent to Officer Andrade's search of Mahama's room.

 2.  *Landlord's Apparent Authority to Consent*

 The government also argues that, even if Leger did not have actual authority to consent to the search, she had *apparent* authority. *See* Doc. No. 50, at 17-18. That argument also fails. A search does not violate the Fourth Amendment if a police officer reasonably believes that a consenting third party has the authority to do so, such as because the officer "reasonably (though erroneously) believe[s] that the person who has consented to their entry is a resident of the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). But that belief cannot be "reasonable" if it amounts to a mistake of law, rather than a mistake of fact. *United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir. 1992) ("*Rodriguez* would not validate, however, a search premised upon an erroneous view of the law. For example, an investigator's erroneous belief that landladies are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search.").

 A mistake of fact, for example, could involve the presence of a romantic partner who claims to live in the defendant's apartment, and who has keys to the apartment and possessions within it, but who in fact is only an occasional guest. An officer could reasonably be factually mistaken about whether that person could consent to a search. *See, e.g., United States v. Goins*, 437 F.3d 644, 648-49 (7th Cir. 2006). Here, it would have been impossible for Officer Andrade to make any mistake of fact regarding Leger's authority to consent to a search of Mahama's room. The body camera footage capturing Officer Andrade's conversation with Leger before

8

entering the house makes clear that Officer Andrade knew that Leger was Mahama's landlord and that Mahama had not yet been evicted. *See* Ex. 2. His alleged mistake, therefore, was one of law: apparently he erroneously believed, or was instructed, that a landlord could consent to a search of a tenant's room when the tenant was absent and/or had not paid their rent. That mistake of law does not give Leger the apparent authority to consent to a search of Mahama's room.

B. Good Faith Exception to the Exclusionary Rule

Because the government has not met its burden to prove that any exception to the warrant requirement is satisfied, I must next determine whether the exclusionary rule applies. The exclusionary rule is a "judicially created remedy" for the violation of a criminal defendant's Fourth Amendment rights. *United States v. Leon*, 468 U.S. 897, 906 (1984). The Supreme Court has explained that the application of the exclusionary rule is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct," *Illinois v. Gates*, 462 U.S. 213, 223 (1983), and "[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348 (1974). The remedial objective of the exclusionary rule is the deterrence of police misconduct. *Id.* at 347.

Consistent with that purpose, where an officer's conduct is "objectively reasonable," or in other words where he acts with "objective good faith," the exclusionary rule should not be applied because it cannot have any deterrent effect. *Leon*, 468 U.S. at 919-20. Ordinarily, an officer's objectively reasonable reliance on a search warrant, even if that search warrant turns out to be defective, constitutes an exception to the exclusionary rule. *Id.* at 922 ("We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial

costs of exclusion."). The good faith exception cannot apply, however, "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; [or] (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (quoting *Leon*, 468 U.S. at 923).

The government argues that the good faith exception applies under *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) (en banc), which extended the exception to circumstances in which police officers rely on a search warrant, but the warrant affidavit included information obtained as a result of a prior unconstitutional search. In those situations, *Ganias* explains that "the good faith doctrine simply reaffirms *Leon's* basic lesson: that suppression is inappropriate where reliance on a warrant was 'objectively reasonable.'" *Id.* at 223 (quoting *Leon*, 468 U.S. at 922). Again, however, reliance on a warrant is unreasonable and the good faith exception cannot apply if the magistrate has been misled about the nature of the prior search. *See Ganias*, 824 F.3d at 223 (good faith exception applies where "the issuing magistrate was apprised of the relevant conduct, so that the magistrate was able to determine whether any predicate illegality precluded issuance of the warrant").

Mahama responds that the good faith exception cannot apply because the police officers misled the judge who signed the first search warrant by not "disclos[ing] all potentially adverse information." *See* Reply, Doc. No. 56, at 9 (citing *United States v. Calhoun*, No. 3:16-CR-92 (SRU), 2017 WL 1078634, at *14 (D. Conn. Mar. 21, 2017)). I agree, though not primarily for

the reasons articulated by Mahama.[1] The affidavit submitted in support of the first search

warrant application admits that Officer Andrade entered Mahama's room and photographed the

firearms without a warrant when it states that "Leger . . . escorted Officer Andrade into the small

single bedroom to view the firearms. . . ." Ex. 6, at ¶ 6. But the affidavit does not disclose the

terms of the lease agreement between Leger and Mahama, nor did the officers attach a copy of

the lease to the search warrant application.[2] The provision of the lease agreement outlining the

scope of Leger's authority over Mahama's rented room would have assisted the Connecticut

judge who signed the warrant in determining whether Leger had the authority to consent to a

search of Mahama's room. Without it, it appears to me that the judge who signed the warrant

assumed that Leger's consent was legally sufficient to render the search reasonable under the

Fourth Amendment. Full disclosure is required for the good faith exception to apply because

only with full information can a judge "determine whether any predicate illegality preclude(s)

issuance of the warrant." *Ganias*, 824 F.3d at 223. Without the benefit of the relevant language

---

[1] Mahama argues that the affidavit is misleading because it states that Officer Andrade "did not manipulate the firearms in any way." Ex. 6, at ¶ 6; *see also* Reply, Doc. No. 56, at 10-11. However, as Officer Andrade testified at the hearing and is confirmed by his body camera footage, he merely repositioned one firearm to make it fully visible on the bed and opened a closed container to reveal another firearm. *See* Ex. 3. He did not unload or otherwise alter any firearm. In any event, the fact of the initial search is stated clearly, and therefore Officer Andrade's actions that potentially constitute further warrantless searches would have been immaterial to the issuance of the warrant. Mahama also argues that the affidavit is misleading because it does not disclose all the information Officer Andrade gathered related to the status of Mahama's tenancy. *See* Reply, Doc. No. 56, at 11-12. But, contrary to Mahama's argument, nowhere does the warrant affidavit state or imply that Mahama had been evicted and nothing in it conveys an impression that he had abandoned the premises. *See* Ex. 6, at ¶ 4 (stating that Mahama was "past due on rent" but describing that his belongings were still present in the room). Therefore, the affidavit accurately discloses all relevant information necessary for the Connecticut judge who signed the warrant to conclude that Officer Andrade had conducted a warrantless search of Mahama's room within the meaning of the Fourth Amendment.
[2] The terms of the lease agreement were available to the detectives before they prepared the first search warrant application. *See* Ex. 2 (Leger showing Officer Andrade a copy of the lease agreement).

of the lease agreement, the judge who signed the warrant at issue here was not put on notice that Officer Andrade's prior search was unconstitutional.

Moreover, *Ganias* not only requires that the judge who signed the warrant be fully informed of the officers' relevant conduct, but also that the police officers' conduct, while violative of the Fourth Amendment, was nonetheless objectively reasonable due to a lack of legal clarity. *See Ganias*, 824 F.3d at 225. That is consistent with the purpose of the good faith exception articulated in *Leon*—deterrence of police misconduct. 468 U.S. at 919-20. In the *Ganias* case itself, for instance, the Second Circuit reasoned that despite the Fourth Amendment violation that had occurred—the police department's retention of mirrored hard drives during the pendency of an investigation—the investigating officers acted reasonably because they had no "significant reason to believe that what [they] had done was unconstitutional." *Id*. (quoting *United States v. Reilly*, 76 F.3d 1271, 1281 (2d Cir. 1996)). *Ganias* relied on an earlier Second Circuit case, *United States v. Thomas*, 757 F.3d 1359 (2d Cir. 1985), in which the same was true: officers conducted a warrantless canine sniff, disclosed that sniff in their affidavit, and the Second Circuit held, as a matter of first impression, that the sniff was a warrantless search.

The good faith exception applied in *Thomas* because the officers had every reason to believe, at the time, that a canine sniff was not a "search" under the Fourth Amendment and did not require a warrant. 757 F.2d at 1368. Here, by contrast, Officer Andrade's Fourth Amendment violation did not occur in a legal gray area. It was in the course of a warrantless entry into Mahama's home, the space where Fourth Amendment protection is at its peak. *See, e.g., United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.,* 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.").

In addition, a landlord's lack of authority to consent to a law enforcement search of a tenant's apartment is neither unclear nor a novel rule of law, as explained previously.

The government's arguments regarding the applicability of the good faith exception are essentially that Officer Andrade's acted cautiously and with an intent to follow the law, for instance because he consulted a supervisor before entering Mahama's room, and there is therefore no intentional misconduct to deter. *See* Opp'n, Doc. No. 50, at 21-22. I agree that Officer Andrade acted with subjective good faith and an intent to follow the law. But the good faith exception depends not on whether the officer subjectively believed his actions were lawful, it applies only when his actions were *objectively* reasonable. *See Leon*, 468 U.S. at 924. A warrantless entry into Mahama's room, without his consent or any exigent circumstance, was not an objectively reasonable mistake of law. Regardless of Officer Andrade or any other police officer's good intentions, police officers' misapprehension of clear Fourth Amendment law must be deterred. Therefore, the good faith exception to the exclusionary rule does not apply in this case.

Because no exception to the warrant requirement or the exclusionary rule applies, I must conclude that Officer Andrade's warrantless search of Mahama's room was unconstitutional, and the evidence discovered as a result—all of the evidence discovered in Mahama's room—must be suppressed. Therefore, I need not address Mahama's argument that items discovered in a closed suitcase within his room should separately be suppressed because law enforcement officers exceeded the scope of a warrant.

## IV.    Conclusion

For the reasons set forth above, Mahama's motion to suppress, doc. no. 34, is **granted**. All evidence obtained from Mahama's room was the fruit of an unconstitutional search by

Officer Andrade because, in sum, that initial search revealed information used to obtain a warrant to conduct a full search, which in turn revealed information used to obtain a warrant to seize firearms and other items in Mahama's room. Therefore, the firearms and all other evidence discovered in Mahama's room as a result of Officer Andrade's warrantless search, and the fruits thereof, shall be excluded at trial.

So ordered.

Dated at Bridgeport, Connecticut, this 15th day of August 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge